THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v
RONALD ROBERTSON, Appellant.

First Department, March 27, 1978

## APPEARANCES OF COUNSEL

*David R. Carlin* for appellant.

*Billie Manning* of counsel *(Irwin Miller* with her on the brief; *Mario Merola, District Attorney),* for respondent.

## OPINION OF THE COURT

Lupiano, J.

The People's case discloses that on November 9, 1973, at about 3:00 A.M., Oliver Stephen, the landlord of a two-family house located at 3343 Paulding Avenue, Bronx, New York, pursuant to complaints made by the downstairs tenant regarding the occupants of the second-floor apartment, investigated those premises. Not receiving a response after knocking on the upstairs apartment door, Stephen entered the apartment by means of a passkey. Though rented, the apartment was virtually vacant. A search of the premises by Stephen disclosed a white powdered substance and glassine envelopes in a box. He notified the police and upon their arrival outside the Paulding Avenue address, informed them that there were drugs in the upstairs apartment. He escorted the police to the apartment and directed them to the box. The officers observed the contents which also included drug paraphernalia. The apartment was secured and these items were brought to the precinct, where a preliminary field test on some of the bags of powder indicated the possible presence of cocaine. This indication later proved to be unfounded. Afterwards the material was returned to the apartment. In the interim, a search warrant was obtained. Further search of the premises disclosed 291 glassine envelopes of heroin in a shopping bag above the bathroom ceiling and an additional quantity in a refrigerator in the kitchen. While officers were present, at about 5:30 P.M. defendant and one Jeffrey Jones entered the apartment. Defendant entered first, followed some 30 seconds later by Jones. After entering the apartment, defendant turned on the lights and was observed to verbally and facially manifest surprise when he noted the presence of cigarette ashes dropped in the kitchen sink by the investigating officers. The officers then revealed their presence and seized the two men. A set of keys to the apartment, rent receipts and a business card from the realty agent who rented the dwelling were subsequently taken from defendant. Defendant's companion, Jones, a furlough absconder from the Eastern New York

Correctional Facility in New York, was carrying a cardboard box containing an electric drill and two large plastic envelopes of heroin.

The defendant did not testify, but his companion, Jones, appeared as a witness on defendant's behalf. According to Jones, he and defendant, whose acquaintance he made while both were serving sentences at Sing Sing Penitentiary, were joined on November 9, 1973 by one "Rose", who presented Jones with a box, rent receipts and a set of keys to the apartment at Paulding Avenue. The box contained a drill, according to "Rose". The purpose of their visit to the apartment and the proposed use of the contents of the box were not testified to. When the two men arrived at the apartment, they let themselves in and were surrounded and frisked by the police. Jones disclosed that he had not been to the apartment prior to that occasion and admitted using a different name to avoid detection as a furlough absconder.

When the upstairs apartment became vacant in August, 1973, the landlord engaged Osborne Real Estate to rent it. Ms. Hall of that agency testified that the apartment was rented by the agency on a month-to-month basis, without a written lease, to an individual who called himself Roosevelt Anderson and gave as his address 263 West 114th Street. Rent and fee receipts were issued on October 11 and 13, 1973, and the only keys in the agent's possession were given to Anderson. No check was made by the agency to determine if Anderson had actually moved into the apartment. Ms. Hall further testified that she had not seen the defendant before the trial.

The jury returned a verdict of guilty on both counts of the indictment—criminal possession of a controlled substance in the first degree and criminally using drug paraphernalia in the second degree.

On appeal, defendant argues that the initial search and seizure by the police of the box and its contents was illegal and the evidence thereafter obtained must be suppressed as "tainted". In denying defendant's pretrial motion to suppress evidence, Trial Term (WEAVER, J.) noted: "unlawful entry by a private person unconnected with law enforcement agents is not a violation of the Fourth Amendment and will not result in the exclusion of the contraband at a criminal proceeding (*People v. Horman,* 22 N Y 2d 1378; *Burdeau v. McDowell,* 256 U.S. 465). Therefore, the question of whether Mr. Stephen was initially authorized to enter the apartment is irrelevant, since

any contraband seized by him would not result in the exclusion of such evidence in the criminal proceeding. However, once Stephen called the police officers to the scene, we must consider whether the officers could enter the apartment and seize the box containing heroin without a search warrant. The purpose of the exclusionary rule is to deter unconstitutional conduct by law enforcement officers *(United States v. Durkin,* 335 F. Supp. 922; *Coolidge v. New Hampshire,* 403 U.S. 443). Stephen, when he first saw the white powder, had no contact with a law enforcement official. He was acting on his own behalf. If Stephen would have removed the powder and taken it to the police station, there would have been no Fourth Amendment violation. However, Stephen did not do that; he called the police officers and informed them of the powder in the apartment. The fact that the police officer entered the apartment at Stephen's instance is of no significance, since Stephen intended to reveal what he had found to the police and to cause such an inspection to be made *(United States v. Durkin, supra,* at p. 926). Once the inspection was made and the powder analyzed and returned to the apartment, the police had sufficient probable cause to apply for a search warrant. It was after the search warrant was signed that a thorough search of the apartment was conducted and the contraband seized."

Regarding the conduct of the landlord, Mr. Stephen, we observe that after his initial entry into the apartment he noted that it was virtually vacant. This fact, coupled with the complaints received respecting these accommodations, led him in his capacity as landlord to examine the premises. Upon discovering the narcotics, he determined to notify the police. This action was complimentary to Mr. Stephen, both in his capacity as a citizen mindful of his duty and responsibilities and as a landlord mindful of his own self-interest. Section 231 of the Real Property Law pertinently provides: "1. Whenever the *lessee or occupant* other than the owner of any building or premises, shall use or occupy the same, or any part thereof, for any illegal trade, manufacture or other business, the lease or agreement for the letting or occupancy of such building or premises shall thereupon become void, and the landlord of such lessee or occupant may enter upon the premises so let or occupied. 2. The owner of real property, knowingly leasing or giving possession of the same to be used or occupied, wholly or partly, for any unlawful trade, manufacture or business, or

knowingly permitting the same to be so used, is liable severally, and also jointly with one or more of the tenants or occupants thereof, for any damage resulting from such unlawful use, occupancy, trade, manufacture or business" (emphasis supplied). Of course it is well recognized that the term "void" in subdivision 1 of section 231 of the Real Property Law means voidable at the option of the landlord (*220 West 42 Assoc. v Cohen,* 60 Misc 2d 983) and it is requisite for a landlord opting to void such lease to evict the tenant by initiating a holdover summary proceeding. We merely allude to the statutory enactment as reflective of the reason and common sense displayed by Mr. Stephen.

Even assuming that the removal of the box and its contents to the precinct house for field tests by the police was improper, the fact that the landlord intended to disclose the presence of suspected narcotics to the police and to cause such an inspection to be made, coupled with the observation by the police of the contents of the box, amply justify the issuance of the search warrant. In issuing the warrant herein based upon the affidavit of Police Officer Donnelly, the court was apprised of the informant's identity, how his information was obtained, and had independent corroborative verification of his account. The underlying circumstances thus conveyed to the court in support of the belief of the affiant as to the reliability of the information justify the issuance of the warrant. Mr. Stephen was not a professional informer, but a private citizen. "The average citizen who provides the authorities with information as to observed criminal activity does so with no expectation of private gain. Rather, he aids the police in enforcing the laws in order to promote the safety and order of the society as a whole" and is not as inherently suspicious as are the undeworld denizens upon whom the police must often rely (*People v Hicks,* 38 NY2d 90, 94). In informing, the landlord subjected himself to civil damages for malicious prosecution if he furnished false information causing a person's premises to be unlawfully searched. The mere fact that an affidavit of the landlord was not presented in addition to that of Officer Donnelly on the application for a search warrant does not, under the circumstances disclosed by the Donnelly affidavit, render the search warrant suspect as not based on probable cause. Possession of drug paraphernalia in itself is illegal, and the issuing Magistrate was informed that such was also found in the apartment. In *People v Reisman* (29 NY2d 278, 284),

the Court of Appeals held that "[i]ndependent untainted evidence establishing probable cause for police conduct will sustain the arrest or seizure even if there has been antecedent illegal conduct by the police."

■ The critical issue on this appeal is whether the circumstantial evidence viewed in its entirety justifies the conviction of defendant on the crimes charged beyond a reasonable doubt. Defendant argues that as he was not the "Roosevelt Anderson" to whom the apartment was rented, he cannot be convicted of possession of the drugs and use of the drug paraphernalia seized at the apartment. The evidence in this case is largely circumstantial and will be briefly summarized: Defendant entered the secured premises and evinced familiarity with the surroundings by immediately turning on the lights and expressing verbal and facial surprise upon seeing the cigarette ashes deposited by the officers in the sink in the kitchen. He possessed the keys to the apartment, the rent receipts and a business card from the realty agent who rented the dwelling. The business card had inscribed on it the name and address of the landlord and a mailing address for the rent. The real estate agent's files list "Roosevelt Anderson's" address as the same given by defendant when his pedigree was taken by the police. The dwelling was virtually devoid of furniture. A business record of Osborn Realty bears a phone number and the legend—"Ask for J.J." Defendant's companion, Jeffrey Jones, admitted that he was referred to by the nickname "J.J."

"While the evidence is circumstantial in nature, the test of its sufficiency is the same 'as in any criminal case, i.e., whether the evidence "points logically to defendant's guilt and excludes to a moral certainty, every other reasonable hypothesis" ' * * * In considering the sufficiency of the evidence, *one should view the circumstances in their entirety.* Nor is it 'necessary for each piece of circumstantial evidence to point to no hypothesis but guilt, but the *totality* must'. *(People v. Cathey,* 38 A D 2d 976.) There is but one logical conclusion which can be drawn from the *totality* of the evidence here presented—that defendant is guilty of the crimes for which he now stands convicted" *(People v White,* 41 AD2d 629, affd 33 NY2d 996; emphasis supplied).

As aptly noted by Judge (now Chief Judge) BREITEL in *People v Reisman (supra,* pp 285-287) "The crime of possessing dangerous drugs requires a physical or constructive possession

with actual knowledge of the nature of the possessed substance [citation]. Knowledge, of course, may be shown circumstantially by conduct or directly by admission, or indirectly by contradictory statements from which guilt may be inferred [citation]. Generally, possession suffices to permit the inference that the possessor knows what he possesses, especially, but not exclusively, if it is in his hands, on his person, in his vehicle, or on his premises [citation]. This, of course, is an elemental inference based on common experience and all but universal probabilities. Thus it is an ancient rule of inference or rebuttable presumption of fact that the recent and exclusive possession of the fruits of any crime warrants the inference of guilt, including, when material, knowledgeable possession [citation]. In the case of contraband its possession is a crime per se, and hence the inference of guilt, that is, knowledgeable possession, is as strong as is the case, for instance, with stolen goods [citation] * * * [I]t makes no significant difference for this purpose whether knowledge is presumed by statute or inferred by reasoning without the benefit of statutory presumption. In either event, the probabilities must justify the one or the other, although the probabilities to support a statutory presumption, it has been said, need not be as great as to support an inference in a criminal case [citation]. Moreover, the foregoing reasoning is particularly applicable to dangerous drugs as the Illinois court said so aptly * * * with reference to possession in premises rather than on the person: '[W]here narcotics are found on premises under defendant's control, it may be inferred that the defendant had both knowledge and control of the narcotics. The inference is based largely upon the nature of the commodity and the manner in which its illegal traffic is conducted * * * [T]hey are sold for exorbitant sums on the black market and are therefore of great value to the person possessing them. Furthermore, since their mere possession may subject such person to severe criminal consequences, the narcotics traffic is *conducted with the utmost secrecy and care.* Human experience teaches that narcotics are rarely, if ever, found unaccountably in a person's living quarters. *(People v. Nettles,* 23 Ill. 2d 306, 308 * * *)'"

*People v Nettles (supra)* cited by the Court of Appeals involved a situation in which narcotics were found in an apartment and a person occupying the premises was prosecuted for their unlawful possession. The key is control of the

premises and at the outset it is noted that control is not necessarily limited to the tenant of rented premises because control can be delegated or shared. "[W]here narcotics are found on the premises under the control of defendant, this fact, in and of itself, gives rise to an inference of knowledge and possession by him which may be sufficient to sustain a conviction for unlawful possession of narcotics, absent other facts and circumstances which might leave in the mind of the jury * * * a reasonable doubt as to his guilt * * *. *The requirement that defendant's guilt be proved beyond a reasonable doubt does not mean that the Court may disregard the inferences that flow from the evidence before it" (People v Nettles,* 23 Ill 2d 306, 308-309; emphasis supplied).

In *People v Mack* (12 Ill 2d 151) police found narcotics in an apartment which showed no signs that it was used as a habitation. Defendant who paid the rent for the apartment lived with his brother at another location. Defendant and others were seen at the apartment and there was a possibility that the janitor of the building also had a key to the premises. Despite the fact that others had access to the apartment, defendant was found to have the requisite possession and control to sustain the conviction for drug possession. The court declared (p 162): " 'possession may be constructive, as well as actual' * * * [T]he keeping of narcotics in a place under the immediate and exclusive control of the accused is possession under a criminal statute." Further, "the rule that possession must be exclusive does not mean that the possession may not be joint * * * [C]ourts of other jurisdictions have held that possession of narcotics may be joint. *(People v Hood,* 150 Cal. App. 2d 197, 309 P. 2d 856; *Gonzales v. People,* 128 Col. 522, 264 P. 2d 508 * * * [T]hese cases express a sound rule. To hold otherwise would permit two or more persons to gain immunity from prosecution on a charge of unlawful possession of narcotics by proving joint possession of the drugs. Such a result would be contrary to reason" *(People v Embry,* 20 Ill 2d 331, 335-336). Respecting circumstances justifying a reasonable inference as to joint dominion and control of contraband or that a person is aiding and abetting another with regard thereto, the court in *People v Hood* (150 Cal App 2d 197) noted: "On the question of joint possession, the observation of the court in *People v Basco,* 121 Cal. App. 2d 794, 796, 264 P. 2d 88, 89, is here apposite: 'A person may be so closely interested in and connected with the unlawful possession of

narcotics by another as to furnish support for a finding that there was a joint possession.' "

■ The common sense experience of life and human nature possessed by those who don the judicial robe and preside over the judicial process, whether at the trial or appellate level, when focused upon the circumstances of the instant crimes as narrated by the witnesses and supported by evidentiary matter, impels the conclusion that the judgment herein be affirmed.

"The People's proof at trial was largely, if not totally, circumstantial. The issue of ultimate fact in such cases is whether the evidence *logically* points to the defendants' guilt and excludes, to a moral certainty, every other reasonable hypothesis [citation]. This issue was properly and fully framed for the jury by the trial court in its charge. On appeal from such a verdict *the reviewing court need not be convinced to an absolute certainty that there exists no hypothesis consistent with defendants' innocence in order to sustain the conviction thereon (People v Regina, 19 NY2d 65, 73-74; People v Harris, 306 NY 345, 351).* Rather, it is enough if the circumstantial evidence is 'direct, substantial and unequivocal' *(People v Regina, supra,* p 72) and the inferences of guilt to be drawn from the circumstances, as opposed to mere suspicions, are *'logically compelling' (People v. Cleague, supra,* p 367)" *(People v Gross,* 51 AD2d 191, 193). Beyond cavil, the court will not lightly strike down a verdict.

To reiterate, the key is control of the premises and such control is not restricted to a lessee (see *People v Tirado,* 47 AD2d 193, affd 38 NY2d 955).

The circumstantial evidence, viewed in its entirety, with reason and common sense employed under the guidance of established legal principles governing appellate review, clearly warrants an affirmance herein. To recapitulate: "[I]t is not true that circumstantial evidence must be such that no possible theory other than guilt can stand, but that the theory of guilt must be beyond a reasonable doubt, i.e., the circumstances must not be consistent with innocence within a reasonable doubt [citation], and the jury must decide. It cannot be possible that circumstantial evidence must amount to a mathematical demonstration while direct evidence need only go beyond a reasonable doubt * * * 'Exclusion of every "possible theory other than guilt" is not required * * * Exclusion of "every other *rational* hypothesis," which means *reasonable*

hypothesis, is the test, and this jury was so instructed. Accepting the foregoing facts no reasonable theory, other than defendant's guilt, occurs to us as accounting for them. Doubtless such was the conclusion of the jurors. We think the evidence is sufficient' " *(Gonzales v People,* 128 Col 522, 527).

Relevant to the demarcation that separates the functions of a jury from those of an appellate court is the following observation in *People v Cohen* (223 NY 406, 422-423): "Viewing the evidence as a whole; making all allowance; using all proper caution, we believe that it presented a question which could only be solved by a jury. The responsibility for the result rests with it. By this statement we do not intend to criticize its action. The jurors saw the witnesses. The claims of the People and the defendant were presented to them with force and ability. Evidently they considered the case with care. Better than a court which reviews but the printed record are they fitted to pass upon the guilt or innocence of the accused." Further, "if there·is a fair conflict in the evidence or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption. [citation.] If, in the judgment of this court, there was a rational doubt of the guilt of the defendant, it would not be a sufficient ground for reversal. Under our system of criminal jurisprudence, it becomes the exclusive province of the jury to determine whether the evidence pointing to the guilt of the accused is so lacking in convincing force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment. When the jury, by their verdict, have declared that no such condition of mental uncertainty has arisen from a contemplation of the evidence, the prisoner has had the full benefit of the rule of law which protects him from punishment, unless his crime is established beyond a reasonable doubt, and the question is not open for review in this court, unless the case is so weak that the verdict should be set aside because against the weight of evidence, or for other sufficient cause. The charge of the trial judge upon this point was full and explicit and eminently fair to the defendant * * * and this proposition was reiterated and emphasized, so that it must have been prominently and pervasively in the minds of the jury when they retired for their final deliberation" *(People v Taylor,* 138 NY 398, 405-406).

The circumstantial evidence herein above summarized serves to conclusively link defendant with the exercise of dominion and control over the apartment and as such justifies the jury's finding that defendant had constructive possession of the drugs discovered therein. The strength of the links in the chain of circumstantial evidence mandates affirmance of his conviction.

Accordingly, the judgment of the Supreme Court, Bronx County (COHEN, J., at trial and sentence; WEAVER, J., at suppression hearing), rendered January 16, 1976, after a jury trial, convicting defendant of criminal possession of a controlled substance in the first degree and criminally using drug paraphernalia in the second degree, should be affirmed.

SANDLER, J. (dissenting). On this appeal from a judgment of conviction for criminal possession of a controlled substance in the first degree and criminal use of drug paraphernalia in the second degree, pursuant to which sentences of 15 years to life and time served respectively were imposed, two basic issues are presented.

1. Were the narcotics and narcotics paraphernalia for possession of which the defendant was convicted obtained through an unlawful search and seizure?

2. Did the evidence, admittedly circumstantial in character, exclude to a moral certainty every reasonable hypothesis consistent with innocence?

In August, 1973, the upstairs apartment of a two-family residence at 3343 Paulding Avenue in The Bronx became vacant. The landlord, Oliver Stephen (not a resident of the building) engaged Osborne Real Estate to rent it.

In October, 1973, Ms. Hall of that agency rented the apartment on a month-to-month basis to a man named Roosevelt Anderson. Anderson first came to the Osborne office on October 11 when he made a down payment on the apartment for which he received a rent receipt. The rental was completed during his second visit on October 13, 1973 when he made a second payment, adding up to one month's rent plus security, received a second rent receipt, and was given the keys to the apartment. During the intervening period Ms. Hall had verified Anderson's employment reference in a telephone call.

Ms. Hall's testimony made it explicitly clear that the defendant was not the Roosevelt Anderson to whom the apartment had been rented.

At about 1:00 A.M. on November 3, the downstairs tenant telephoned Mr. Stephen to complain of "strange noises" in the upstairs apartment. As a result of that call, and earlier anonymous calls about "traffic going through his house" Stephen went to the second floor apartment, knocked on the door, and, receiving no response, entered with his passkey.

The apartment was sparsely furnished. During a search Stephen found a large carton on top of a wooden closet in one of the bedrooms, containing glassine envelopes and a white powdery substance he believed to be narcotics. He called the police who arrived at 6:50 A.M. Stephen escorted them to the second floor apartment and led them to the bedroom where he had found the box. He removed a glassine envelope from the box and showed it to the officers who then took the box from the closet, with its contents, and brought it to the station house.

After a chemical test conducted at the station house suggested the presence of cocaine (later to be proved erroneous, the narcotics in fact being heroin) a search warrant was obtained. The box and its contents were returned to the apartment, which had been previously secured by the police. A thorough search of the apartment shortly after 5:00 P.M. resulted in the finding of substantial quantities of heroin in a panel ceiling in the bathroom and in the refrigerator.

At approximately 5:30 P.M. the defendant, followed seconds later by a man named Jeffrey Jones, entered the apartment. The defendant turned on the light and apparently registered surprise on seeing cigarette ashes in the sink. The two men were then arrested. The defendant had in his possession a set of keys to the apartment, the two rent receipts described above, a business card from the realty agent on which was noted the address of the landlord, and a gun. Jones was carrying a box which contained a drill in addition to two large plastic bags with heroin.

Only the defendant was indicted with regard to the contraband found in the apartment.

Jones testified on behalf of the defendant and stated that earlier during the day a man named Rose gave him the box, the rent receipts and a set of keys to the apartment. As they arrived at the building Jones had given the keys to Robertson, who also had taken from the sun visor of their car the rent receipts and the business card.

On the issue of the lawfulness of the search, it is not legally

significant whether the entry by the landlord into the apartment at 3:00 A.M. was lawful, since the constitutional requirements of the Fourth Amendment have no application to the actions of private individuals.

It is, of course, fundamental that the finding of narcotics in an apartment by a private citizen does not authorize, in the absence of exigent circumstances not claimed to be present here, an entry into and search of that apartment by the police. (See *Weeks v United States,* 232 US 383; *Mapp v Ohio,* 367 US 643; *People v Gonzales,* 39 NY2d 122.) Nor may such a police entry and search be authorized by a landlord, even one who himself may have had a lawful right to enter the apartment of a tenant for purposes connected with their relationship. *(Stoner v California,* 376 US 483.)

In *Stoner,* the Supreme Court said the following (pp 489-490):

"[T]he Court has held that a search by police officers of a house occupied by a tenant invaded the tenant's constitutional right, even though the search was authorized by the owner of the house, who presumably had not only apparent but actual authority to enter the house for some purposes".

"[T]o uphold such a search without a warrant would leave tenants' homes secure only in the discretion of their landlords."

I am in agreement that the search warrant here could properly have been issued on the basis of those observations of the landlord himself that were communicated to the court. A troublesome problem here, however, becomes apparent from an examination of the minutes accompanying the issuance of the search warrant. The issuing Judge was understandably troubled by the apparent illegality of the police entry and the knotty problem presented of whether the situation could somehow be rectified to permit lawful seizure of the drugs. The minutes make clear that the Judge issued the warrant, not because he had made a judgment that the landlord's observations were sufficiently reliable to justify it, but rather because he concluded erroneously that the police entry could be sustained on the factual finding that the landlord had opened the door.

In *People v Reisman* (29 NY2d 278) relied upon in the court's opinion to sustain the warrant, the court upheld the arrest there under challenge as the result of antecedent illegal police activity on the view that it was justified by other

information available to the arresting officer and that the arrest would have in fact occurred if only that other information had been available. It is by no means clear to me that this principle may appropriately be extended to sustain a warrant where the issuing Judge, though aware of the landlord's observations, gave his approval explicitly on the basis of police observations following their unlawful entry into the apartment. That issue, however, need not be resolved in this case, since I think it clear that the conviction, even assuming the contraband was secured lawfully, cannot stand.

Turning to the issue of legal sufficiency, it is apparent that the evidence presented was circumstantial in character. The applicable rules are, of course, familiar.

The facts from which the controlling inferences are drawn must themselves have been proved and not presumed. (See, e.g., *People v May,* 290 NY 369, 371.)

The circumstances must be based upon clear and convincing evidence and not conjecture. (See *People v Foley,* 307 NY 490, 492-493.)

In the words of *People v Lagana* (36 NY2d 71, 73-74): "[F]or a conviction based exclusively upon circumstantial evidence to stand, the hypothesis of guilt should flow naturally from the facts proved, and be consistent with them, and * * * the facts proved must exclude to a moral certainty every reasonable hypothesis of innocence."

The District Attorney has attempted to sustain the conviction on a theory of constructive possession primarily associated with *People v Nettles* (23 Ill 2d 306). In *Nettles,* the court upheld the conviction for possession of narcotics of a defendant actually present in the apartment with others when the narcotics were found and who admitted that he had shared the apartment with still another person although he denied having paid the rent.

The court stated the basic rule of law in the following words (p 307): "In order to support a conviction for unlawful possession of narcotics, the People must establish knowledge on the part of the defendant of the presence of narcotics and must also establish that the narcotics were in the immediate and exclusive control of the defendant."

Commenting on the special character of the narcotics traffic the court noted (p 308): "Human experience teaches that

narcotics are rarely, if ever, found unaccountably in a person's living quarters."

Finally, the controlling principle was stated as follows (pp 308-309): "We are of the opinion, therefore, that where narcotics are found on the premises under the control of defendant, this fact, in and of itself, gives rise to an inference of knowledge and possession by him which may be sufficient to sustain a conviction for unlawful possession of narcotics, absent other facts and circumstances which might leave in the mind of the jury * * * a reasonable doubt as to his guilt."

In *People v Mack* (12 Ill 2d 151), one of two earlier Illinois cases relied upon by the court in *Nettles,* a conviction was sustained where narcotics were found in an apartment which the defendant admitted renting, and from which the defendant had been observed leaving shortly before the discovery. In *People v Embry* (20 Ill 2d 331) the other case relied on in *Nettles,* the defendant was present in the apartment when the narcotics were found and admitted that it was his apartment.

The *Nettles, Mack* and *Embry* cases are typical of almost all the unusually large number of Illinois cases dealing with aspects of the problem. Invariably the issue has been the legal sufficiency of evidence to sustain a conviction with regard to someone either present in the apartment at the time the narcotics are discovered or observed to have been in the apartment previously and who in addition was either the lessee of the apartment or had been living in the apartment.

Interestingly, in one Illinois case, the conviction was set aside with regard to a defendant present in an apartment at the time marijuana was found where "no competent evidence was presented showing that the defendant owned, rented or ever lived in the room in question." *(People v Heerwagen,* 30 Ill App 3d 144.)

I found no Illinois case in which a conviction was upheld with regard to narcotics found in an apartment where the defendant was not in the apartment at the time nor shown to have been occupying the apartment previously.

Nor is there any New York case in which a conviction has been sustained under such circumstances. Indeed, very few cases in this State have addressed even the general problem presented in the Illinois cases.

Perhaps the closest case to the *Nettles* situation was *People v Tirado* (47 AD2d 193, affd 38 NY2d 955) in which this court

sustained the conviction of the lessee of an apartment for narcotics found in the apartment while the defendant was present along with others. This court relied in significant part on the fact of the presence in the kitchen "in plain view, of recognized adulterants and drug paraphernalia" (pp 195-196). In affirming the decision of this court, the Court of Appeals commented that "the circumstances established the operation of a narcotics 'factory', and the inference that the tenant as well as all those found in the apartment, were engaged in the illicit enterprise, was irresistible" (p 956).

Two other New York cases, not dispositive here because of widely different fact situations, are nonetheless of interest. In *People v Schriber* (34 AD2d 852, affd 29 NY2d 780) the defendant was the lessee of an apartment which he permitted to be used as a gathering place for marijuana smokers. Friends of the defendant, but not the defendant himself, were present in the apartment when marijuana and related implements were found. The defendant had not lived in the apartment for a week before the search although some of his clothing was still there. His conviction for possession of the marijuana was reversed on the view that the facts did not establish that degree of control of the premises that would give rise to an inference of unlawful possession.

Again, in *People v Jefferson* (43 AD2d 112) three people in addition to the defendant were present in an apartment in which narcotics were found. During the search, the defendant emerged from a bedroom in his underwear. This court reversed the conviction and dismissed the indictment commenting (p 113): "the defendant did not claim possession of the goods in the apartment * * * and the evidence did not show that defendant was the lessee or exercised such control over the premises that he could be deemed in constructive possession of the contraband found". (See, also, *People v Siplin,* 29 NY2d 841.)

In evaluating the evidence in this case, three facts seem to me of primary significance.

1. The apartment had been rented some three and one-half weeks before the narcotics were found to someone other than the defendant. This other person had paid one month's rent and an additional month's security.

2. No evidence was presented that identified the defendant, the lessee, or anyone else as having been actually present in the apartment prior to the discovery of the narcotics.

3. The defendant, in physical possession of keys to the apartment, the rent receipts that had been given to the lessee, and a business card of the realty company on which was noted the home address of the landlord, came to the apartment some 14-½ hours after the narcotics were first discovered.

I am in agreement that the jury could have reasonably concluded from the defendant's possession of the keys, rent receipts, and a business card with the landlord's home address noted on it that ownership, or partial ownership, of the apartment had been transferred to the defendant by the lessee or an agent of the lessee or a successor in interest prior to the defendant's arrival. The critical question, of course, is when that transfer occurred. If it had been established beyond a reasonable doubt that the defendant had received these indicia of ownership prior to the discovery of the narcotics, a plausible case for sustaining the conviction would have been made out. Even on that assumption, however, the absence of any evidence placing the defendant in the apartment prior to the finding of the drugs would have made the issue of constructive possession a close one.

I see no way in which the trial evidence can be evaluated to exclude as a reasonable possibility that the defendant acquired an ownership interest in the apartment after the drugs had been found. Indeed, the very fact of the defendant's physical possession of the rent receipts and the business card at the time of his arrest strongly suggests that he was in fact arriving at the apartment for the first time.

In any event, the clear possibility that the defendant came into possession of the indicia of ownership after the narcotics were found, coupled with the total absence of evidence placing him in the apartment previously, requires reversal of the conviction.

Nothing in *Nettles,* or any of the cases applying it or addressed to the same problem, provide any support for a finding of constructive possession on these facts. The evidence simply does not establish with sufficient certainty that the defendant had control of the apartment when the narcotics were found, much less the further inference that he had knowledge and control of the narcotics. The "logical gaps," alluded to in *People v Cleague* (22 NY2d 363) are here too substantial to sustain the conviction.

The labored trial effort to find a sinister significance in the defendant's ability to find the light switch without difficulty

and his alleged surprise at observing ashes in the sink is surely of the slightest possible value. One does not have to be familiar with an apartment to be surprised at observing ashes in the sink, even if it were accepted that he expressed surprise at that observation rather than at the almost simultaneous discovery that others were present in the apartment.

The judgment of conviction rendered below should be reversed and the indictment dismissed.

KUPFERMAN, J. P., YESAWICH, and SULLIVAN, JJ., concur with LUPIANO, J.; SANDLER, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on January 16, 1976, affirmed.