The People of the State of New York, Respondent, v Clarence Adams, Appellant.

First Department, January 22, 1980

## APPEARANCES OF COUNSEL

*Henry Winestine* of counsel *(William E. Hellerstein,* attorney), for appellant.

*Timothy J. McGinn* of counsel *(Steven R. Kartagener* with him on the brief; *Mario Merola, District Attorney),* for respondent.

## OPINION OF THE COURT

Lupiano, J.

Defendant stands convicted, after a jury trial, of the attempted murder of Housing Patrolman Rudolfo Quinones. According to the officer's testimony at the suppression hearing, he saw a man, later identified as defendant, holding a gun to a woman's head at 9:00 P.M. on September 13, 1976. The officer, approximately 25 feet from defendant, drew his weapon and ordered the latter to drop his weapon. As defen-

dant hesitated, the woman he was holding fled. Defendant thereupon fired two shots at the officer which missed. Patrolman Quinones fired two shots in response, and defendant fell to the ground. As Quinones approached, defendant suddenly wheeled and fired two more shots which missed. Thereupon defendant escaped into the gathering crowd and eluded capture. The weapon used by the assailant appeared to Officer Quinones to be either a .32 or .38 calibre revolver. Police responded to the patroman's call for assistance. A woman, Arah Blue, approached and identified herself to the police as the girlfriend of the gunman, defendant herein. She provided defendant's name and address and urged the police to go to his apartment because he had threatened to kill her and kept weapons and ammunition at the apartment and she was afraid that he would succeed in that endeavor. She escorted the police to the defendant's apartment and gave them access by opening the door to defendant's apartment with a key which she was carrying. Nobody was inside the apartment at this time. Arah Blue pointed out to the police the closet in which, according to her, defendant stored his weapons. Inside, the police found, as indicated by Ms. Blue, a .308 calibre rifle, 25 rounds of ammunition for the rifle and 44 rounds of .32 calibre ammunition. The police did *not* otherwise search the apartment or conduct a general search.

Defendant's pretrial motion to suppress the rifle and ammunition was denied, after a hearing, the hearing court being of the view that since the apartment belonged to defendant, it was incumbent upon the police to go there to attempt to find him without delay. Further, the hearing court ruled that as permission to enter was granted to them by one who, having her own key, ostensibly possessed the authority to admit them and as such individual, physically present in the apartment, directed the police to the exact spot where the rifle and ammunition were located, there was no need to obtain a search warrant, and the limited search was properly conducted.

Arah Blue had known defendant for about a year, living with him occasionally and had a key to his apartment. At trial she testified that on the night of September 13, she was admitted to the apartment by defendant's children, defendant not being at home. When defendant subsequently arrived, he was upset to find Blue there and berated his son for letting her in. After commencing to beat the child, Blue intervened and fled from the apartment pursued by defendant. She went

down the stairwell, while defendant took the elevator. Officer Quinones testified that he was on duty across the street from defendant's residence when he heard a scream and saw defendant holding a gun to a woman's head. The officer, in uniform, ordered defendant to stop. Instead, defendant pointed what appeared to be a .32 or .38 calibre pistol at the officer and fired. Ms. Blue stated that she emerged from the apartment building just as defendant began firing on Officer Quinones. She ran down the street and encountered Housing Police Officer Carl Peters whom she asked for help in getting the children safely out of the defendant's apartment. She told Peters about the attack on Officer Quinones. Peters declared that he accompanied her to the apartment and after they were let in by the children, waited while Ms. Blue gathered up some belongings. He then brought them all to a radio car which had arrived downstairs.

In the interim, several officers had responded to Quinones' call for assistance and had joined him in combing the area for defendant. This search had proved fruitless when Ms. Blue approached and advised them of defendant's name and address and her fear that defendant would harm her. She led them to defendant's apartment and opened the door with a key which she was carrying. Defendant, not being in the apartment, Ms. Blue called the officers' attention to a closet where she told them he kept his weapons. The rifle and ammunition containing, *inter alia,* 44 rounds of .32 calibre ammunition (remaining in a box of 50) alluded to above were seized.

Defendant, testifying in his own behalf, stated that he had previously told Ms. Blue that he did not want to see her again. Finding her at the apartment on the evening of the 13th, he admitted chastising his son, but denied striking him. On opening a drawer to drop off his keys, he noticed that money was missing and demanded that Blue return it. She denied having the money and when he ordered her to strip so that he might search her, she fled. He followed, taking the elevator, although unaware of how Blue might have gotten downstairs. When he arrived at the street and did not see her, he began jogging to her house when a police officer, secreted behind some bushes, "sprang out," ordered defendant to stop and shot at him before he could comply with the command. Defendant stated that he fled, but did not return the officer's fire as he was not carrying a gun. He explained that the full box of .32

calibre ammunition had been found by him on the subway and that he did not own a gun. He could not account for the missing six rounds.

On appeal, defendant first argues that the warrantless search of the closet was unconstitutional because Ms. Blue, his girlfriend and sometime resident of the apartment, did not have the authority to consent to the search of the closet, and because when she reported the weapons in the closet, the police were obligated to safeguard the premises and obtain a warrant. The People aptly rely on this court's opinion in *People v Robertson* (61 AD2d 600, affd 48 NY2d 993) for the proposition that the warrantless seizure and removal of the ammunition at the instigation of Ms. Blue, who had a key to the premises, was proper. This limited search was, in effect, conducted by Ms. Blue, a private individual, not the police. If Ms. Blue had entered the closet and had given the ammunition to the officers who were lawfully on the premises (defendant concedes that the police could properly enter the apartment for the purposes of making an arrest since Ms. Blue reported to them that defendant threatened to kill her and had fired at Officer Quinones), there would be no basis for suppression. This result should not change simply because the officers went into the closet at Ms. Blue's direction, especially where their actions were limited in scope and where a general exploratory search was not conducted.

There was no presearch governmental encouragement or investigation involved here having as its goal the violation of defendant's Fourth Amendment right to be free of unlawful search and seizure. The rule enunciated in *Burdeau v Mc-Dowell* (256 US 465) states that the Fourth Amendment gives protection against unlawful searches and seizures involving governmental action and does not apply to the acts of private individuals in taking the property of another. Ms. Blue had a key to the premises, and by utilizing the key gave access to the apartment to the police. The key is symbolic of control of the premises, subject, of course, to the actual state of control as exemplified by the surrounding and unfolding circumstances. At the time of the seizure of the ammunition and rifle from the closet, the knowledge of the police was limited to the facts of Ms. Blue having a relationship with defendant, having a key to the apartment, having requested and obtained police aid in securing the safety of her person and of the defendant's children, and of enabling her to remove some of her posses-

sions from the premises. The major concern of the police was to apprehend the defendant and to protect Ms. Blue. It was subsequent to the seizure that Ms. Blue imparted to the police information that she had a residence of her own elsewhere. Of critical import, Ms. Blue did not give the police any consent to search the premises, but only directed their attention to the closet where she knew defendant kept his weapons and ammunition by virtue of her relationship and experiences with defendant (see *People v Cosme,* 48 NY2d 286).

At the suppression hearing the People argued for the reasonableness of the police conduct herein, pointing out, *inter alia,* that Ms. Blue, who was, apparently, a victim, gave information to the police that she was the girlfriend of defendant, knew the apartment where he lived and that he had weapons in that apartment. Asserting that the police had a duty to go to the apartment and that such conduct is to be viewed as in the nature of "hot pursuit" under the circumstances, the People aptly point out that a general search of the apartment was not conducted. Obviously, the police officers, as reasonable men, believing at that time that the perpetrator might have returned to the apartment to hide as they had not as yet found him, and in close proximity in time to the incident and in space to the apartment, accompanied Ms. Blue to the apartment. Their conduct herein does not appear to be unreasonable, and the policy considerations underlying application of the exclusionary rule *to deter* conduct of the sovereign aimed at violating the individual's right to be free from unlawful search and seizure would not be served by suppressing the rifle and ammunition under the circumstances herein. The hearing court, in denying defendant's motion to suppress, stated: "The woman who was the original person from whom all this flowed (in the sense that the altercation between defendant and Ms. Blue in the apartment precipitated the critical events narrated above), directed the police officers to where the weapons and ammunition were and I find nothing whatsoever wrong in the manner in which the search was conducted. No warrant was necessary under the circumstances of this case. Permission was granted by somebody who ostensibly had permission, having had the key and knowing the defendant as well as she did."

Next, defendant contends that proof of an uncharged crime, to wit, possession of the rifle in the closet, was improperly adduced at trial. The contention is without merit. While

possession of a rifle in one's home *within* the City of New York, without a permit and certificate of registration from the Firearms Control Board is a misdemeanor (Administrative Code of City of New York, § 436-6.14), no prejudice to defendant resulted. The mere fact that defendant possessed a rifle does not give rise to the inference that defendant had a propensity to shoot people. References to the rifle were on the record essentially inadvertent, and even assuming some prejudice was engendered thereby, in view of the entire record, such prejudice did not rise to a degree sufficient to warrant a reversal.

The second evidentiary ruling complained of concerns the trial court's refusal to admit into evidence a "firearm discharge report" prepared by a Sergeant White in consequence of White's questioning of Officer Quinones. The report indicated that Quinones had observed defendant holding a gun on Ms. Blue which to some extent contradicts Quinones' trial testimony that he could not be sure whom defendant held the gun on. This report was not prepared by Quinones and thus could not be used to impeach him as *his* prior inconsistent statement. In the absence of Sergeant White's testimony, no proper foundation was laid for its admission as a business record exception to the hearsay rule. In any event, defense counsel was able to convey the information contained in the report to the jury during his attempt to have the report admitted. Further, a report prepared *by Quinones* which recited that complainant (Ms. Blue) reported that defendant held a gun to her head was admitted at trial as tending to impeach the officer's trial testimony. No prejudice to defendant is demonstrated.

Finally, defendant argues that the trial court erred in refusing to charge reckless endangerment in the first degree as a lesser included offense and for failing to charge the affirmative defense of extreme emotional disturbance (Penal Law, § 125.27, subd 2, par [a]). Defendant was tried for the crimes of attempted murder in the first degree and criminal possession of a weapon in the second degree, to wit, a loaded pistol with intent to use the same unlawfully against another. As for reckless endangerment (charged in the indictment, but dismissed on the People's motion prior to trial with leave to the defense to require such a charge if the evidence supported it), there was nothing reckless about defendant's conduct according to the People's witnesses. Defendant fired twice;

then feigned that he was hit by the officer's return fire; and then got up and fired twice more as the officer approached. According to defendant, who took the stand in his own defense, he never fired at the officer because he did not have a gun and never had a gun. Thus, on this record the jury was presented with conflicting versions of the incident indicating either that defendant acted *intentionally in shooting at the officer,* or did not shoot at all. No reasonable view of the evidence would, therefore, support a finding of reckless endangerment.

Similarly, defendant's failure to raise the affirmative defense of extreme emotional disturbance when he testified served to preclude him from having the jury consider this issue. New York, by permitting the extreme emotional disturbance defense, enables a "defendant to establish the existence of mitigating circumstances, collateral to the principal facts at issue * * * The purpose of the extreme emotional disturbance defense is to permit the defendant to show that his actions were caused by a mental infirmity not arising to the level of insanity, and that he is less culpable for having committed them" *(People v Patterson,* 39 NY2d 288, 302). Defendant at trial did not advance the position that he committed the acts alleged to have been committed by him, but did so in light of a mental infirmity rendering him less culpable. No! Defendant's position was that he did not commit those acts. Defendant bears the burden of persuasion for demonstrating that he acted under the influence of extreme emotional disturbance. On this record the People did not obviate this burden on defendant's part by their own case. Accordingly, defendant has no cause for complaint.

"The common sense experience of life and human nature possessed by those who don the judicial robe and preside over the judicial process * * * at the * * * appellate level, when focused upon the circumstances of the instant crimes as narrated by the witnesses and supported by evidentiary matter, impels the conclusion that the judgment herein be affirmed" *(People v Robertson,* 61 AD2d 600, 609, *supra).* In applying the myriad rules promulgated in the criminal law and to safeguard the rights of the individual while at the same time vouchsafing to society and the State protection of their legitimate interest, we must be mindful that the more intelligible the application is to the common sense of the citizenry, the more vital will be their support for the essential

goal of our system of jurisprudence—the dispensation of justice founded on truth. Conversely, the less intelligible the application is to the common sense of the citizenry, the more will their support for such a necessary goal of civilization erode with dire consequences for the body politic. Indeed, it is this overriding consideration which mandates that we judge police conduct from the point of view of its reasonableness under the circumstances, having due regard for the interrelation of rights with their corresponding duties. It is in the spirit of the endeavor to render intelligible the complex of criminal law, especially as it relates to the police conduct herein, that the aforesaid analysis is presented.

Accordingly, the judgment of the Supreme Court, Bronx County (SILBERMANN, J.), rendered April 12, 1978, convicting defendant, after a jury trial, of attempted murder in the first degree, should be affirmed.

LYNCH, J. (dissenting). The majority has affirmed the trial court's refusal to charge the affirmative defense that the defendant shot at Officer Quinones while under extreme emotional disturbance for the reason that the defendant himself had denied any shooting. I find this contrary to the firmly established principle of New York law that a defendant is entitled to raise inconsistent defenses *(People v Gaimari,* 176 NY 84, 93; *People v Lo Cicero,* 27 Misc 2d 217, 242, revd on other grounds 17 AD2d 31, mod 14 NY2d 374; *People v Chambers,* 56 Misc 2d 683, 685). The principle is widespread through other jurisdictions (see 22 CJS, Criminal Law, § 54). In many of them an exception has been made for the defense of entrapment, that is, the defense is not available to a defendant denying any participation (see Ann. 61 ALR2d 677). But, with respect to this limited exception, it has been suggested that it "seems to be erroneous and there is a recent trend to allow the defendant to raise inconsistent defenses when entrapment is pleaded. This also appears to be the trend in the federal courts" (7 NY Crim Prac, par 63.5 [2], p 63-43).

A plea of not guilty does not evoke only those defenses that are consistent; it evokes all possible defenses *(People v Lo Cicero, supra,* p 243; see, also, *Henderson v United States,* 237 F2d 169, 172). Since the rule of inconsistent defenses is but a restatement of this precept, there is no reason, apart from legislative direction (see CPL art 250), why it should not be applicable to all defenses including those denominated affirmative *(People v Chambers, supra;* Penal Law, § 25.00). I find,

therefore, that the defendant's denial of any shooting would not, of itself, preclude the affirmative defense of extreme emotional disturbance.

Granted that the defendant had the burden of establishing the defense by a preponderance of the evidence (Penal Law, § 25.00, subd 2), he is not relegated to the entirety of his own version. The jury is entitled to choose whatever of the defendant's version it finds credible *(People v Johnson,* 45 NY2d 546), and, especially important here, the defendant may prove his defense by resort to whatever evidence presented on the prosecution's side that the jury finds credible *(People v Steele,* 26 NY2d 526).

The jury here could have considered the defendant's testimony: that he found Arah Blue in his apartment three or four weeks after he had told her he did not want to see her again; that he found $245 missing that he had saved for his children's school tuition; that Arah Blue denied taking the money but refused to be searched and ran from the apartment; that the defendant chased her to the street.

The jury could have considered Miss Blue's testimony: that the defendant returned home to find that his son had let her into the apartment; that because the defendant did not want her there he began beating his son; that she attempted to interfere but he began to beat her as well; that he threatened to kill both her and his son, and, when he went to get his gun, she ran out of the apartment and down 12 flights of stairs; that the defendant beat her to the street, apparently having taken the elevator; that when she arrived at the street the defendant was already shooting at Quinones. Viewing all of this in the light of the testimony of Officer Quinones, one would conclude that when the defendant rushed out on the street he grabbed and pointed his gun at a woman who was a stranger to everyone and that there was no motivation for his firing at the officer except for the latter's command to drop the gun.

I find in all of this testimony evidence in support of the affirmative defense sufficient at least for a jury question *(People v Argibay,* 45 NY2d 45). I would reverse the conviction and remand for a new trial.

I agree with the majority that suppression should be denied. I cannot agree with its reason that would allow the policemen, who went into the closet to seize the weaponry, to be considered by some process of metempsychosis not to be policemen

but to be the person who had told them what was hidden in the closet. I would deny suppression on probable cause (which is unquestioned) and the exigent necessity of instantly seizing what to the police had to be a cache of weapons and ammunition of a man who was at large and extremely dangerous because he had just senselessly fired four shots at a fellow officer.

LANE, J., concurs with LUPIANO, J.; MURPHY, P. J., and KUPFERMAN, J., concur in result only; LYNCH, J., dissents in an opinion.

Judgment, Supreme Court, Bronx County, rendered on April 12, 1978, affirmed.