■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v REGINALD E. PHILLIPS, Appellant.—Judgment, Supreme Court, New York County, rendered October 13, 1977, convicting defendant, after jury trial, of robbery in

the first degree, affirmed. To the factual delineation ably set forth in the dissent, we add the following observations: The lighting in the elevators where complainant, Maria Figueroa, was robbed was good at the time of the incident; complainant, after the incident, realized that she had seen the defendant in the neighborhood; complainant resisted the defendant and took part in the subsequent chase of defendant; two weeks later, complainant recognized defendant, who was approximately 12 feet away and wearing the same windbreaker and glasses as at the time of the crime; she immediately notified the police, which action resulted in the prompt arrest of defendant. Contrary to the dissenters' view, the testimony of the complainant, Maria Figueroa, was not suspect as to its accuracy and reliability. Ms. Figueroa had ample opportunity to observe the defendant. First, while in a well-lit elevator, the defendant at close range struck her in the face and ran off with her purse. She thereafter pursued the robber down 10 flights of stairs and into an adjoining building. During this period of time it cannot be said that complainant did not have sufficient opportunity to carefully observe the defendant. Moreover, and contrary to the defendant's claim that complainant was "shaky" when she identified the defendant on the street two weeks later, Ms. Figueroa, on her own initiative, recognized the defendant and immediately obtained police help. This *spontaneous* encounter involved no suggestive influence whatsoever and is wholly credible. Although complainant's description to the officer and detective, as recorded by them, was not totally inclusive in that it failed to state the defendant wore glasses and had a goatee, the other characteristics furnished by complainant at the time clearly matched those of the defendant. In addition, complainant at trial unequivocally stated that she had in fact told the officer that the defendant had a goatee and glasses, and it was for the jury to believe or disbelieve whether the officer and detective in error failed to record such fact. Although the other victim, Daren Johnson, was not able to identify the defendant, this fact is irrelevant since the defendant's accomplice had ordered Johnson to keep his head down during the course of the robbery. Further corroborative evidence of the defendant's guilt is the fact that the defendant lived in a building adjacent to complainants and the man who complainant and the others chased into the adjacent building never emerged from that building. This fact tends to suggest that the robber lived in the adjacent building. Although complainant was not wearing her glasses at the time of the robbery, she explained at trial that the glasses were only necessary for reading, and that her failure to wear glasses at the time of the robbery in no way impeded her ability to identify the defendant. The dissenters conclude that defense witness, Olga Benitez, was improperly impeached when the trial court allowed the prosecutor to ask her whether she had reported to the authorities her alleged observation that the police had the wrong person. The issue of whether the People may properly cross-examine a defense witness with regard to the failure of the witness previously to communicate exculpatory information has been frequently litigated. It is recognized that such witness may properly be cross-examined as to when and to whom the witness first disclosed the exculpatory information, as such circumstances obviously bear on the credibility of the witness' testimony (see *People v Colarco,* 68 AD2d 430). With respect to the questions posed on cross-examination to defense witness Benitez, it is clear that such questions, at least on their face, did not suggest that the defense witness had a duty to report to the police. Indeed, in summation, the prosecutor did not argue that the defense witness had an obligation to come forward, but argued that it was incredible for her not to. These are obviously two distinct

things. Specifically, the prosecutor argued as follows: "Here is somebody she knows who is arrested for a crime and she claims that she knows that he didn't do it. He wasn't the man. Never told anybody. Never told anybody and that is incredible. Can you believe that that woman sat with that information for a year, over a year, and never told the District Attorney about it?" The passing reference to the District Attorney as one among the many to whom defense witness could have communicated the exculpatory information does not serve of itself to convey to the jury the impermissible suggestion that there is a duty on the part of the defense witness to report to the prosecution rather than to the defense or anyone else. There is no objective support in the record for the dissenters' view that the jury in the instant matter was composed of "impressionable" individuals. "Trial by jury is an integral part of our system of justice. Its advocates, despite the attacks on the jury system, point with justifiable pride that this right to a trial by one's peers stands as a safeguard against tyranny and possible abuse of power by the State. Accordingly, we must give credit to the common sense and reason of our fellow man who sits as a juror in fulfillment of the responsibilities which our system of justice bestows on him" *(People v Johnson,* 61 AD2d 923, 927). "Relevant to the demarcation that separates the functions of a jury from those of an appellate court is the following observation in *People v Cohen* (223 NY 406, 422-423): 'Viewing the evidence as a whole; making all allowance; using all proper caution, we believe that it presented a question which could only be solved by a jury. The responsibility for the result rests with it. By this statement we do not intend to criticize its action. The jurors saw the witnesses. The claims of the People and the defendant were presented to them with force and ability. Evidently they considered the case with care. Better than a court which reviews but the printed record are they fitted to pass upon the guilt or innocence of the accused.' Further, 'if there is a fair conflict in the evidence or it is such that different inferences can be properly drawn from it, the determination of the jury will not be interfered with, unless it is clearly against the weight of evidence, or appears to have been influenced by passion, prejudice, mistake or corruption. [citation.] If, in the judgment of this court, there was a rational doubt of the guilt of the defendant, it would not be a sufficient ground for reversal. Under our system of criminal jurisprudence, it becomes the exclusive province of the jury to determine whether the evidence pointing to the guilt of the accused is so lacking in convincing force as to leave an intelligent and discriminating mind in doubt as to the truth of the charge contained in the indictment. When the jury, by their verdict, have declared that no such condition of mental uncertainty has arisen from a contemplation of the evidence, the prisoner has had the full benefit of the rule of law which protects him from punishment, unless his crime is established beyond a reasonable doubt, and the question is not open for review in this court, unless the case is so weak that the verdict should be set aside because against the weight of evidence, or for other sufficient cause * * *' *(People v Taylor,* 138 NY 398, 405-406)" *(People v Robertson,* 61 AD2d 600, 610). Concur—Kupferman, Sullivan and Lupiano, JJ.

Murphy, P. J., and Carro, J., dissent in a memorandum by Murphy, P. J., as follows: On the afternoon of May 3, 1976, Maria Figueroa entered the elevator in her building at 210 East 102nd Street. Three men and one teenager entered the elevator with her. One man exited at the fourth floor. As the elevator then proceeded toward the 10th floor, a second man, alleged to be defendant Phillips, held a knife to Figueroa's throat. Defendant's accomplice, an unidentified third man, also held a knife to the throat of a

teenager named Daren Johnson. The two robbers took Figueroa's pocket-book and exited on the 10th floor. Figueroa pursued the two robbers down the staircase. The defendant's accomplice escaped. However, Figueroa and her neighbors pursued the defendant to a nearby building located at 220 East 102nd Street. A subsequent search of that building by the police failed to reveal the presence of the defendant or any other suspect. Two weeks after the robbery, Figueroa saw the defendant walking in the community. She stopped a passing police car and the officers then arrested the defendant. Daren Johnson, the teenager, was not able to identify the defendant at trial. Thus, the defendant's conviction hinged entirely on the identification made by complainant Figueroa. She originally told the investigating officers that the robber was (i) black, (ii) 25 to 29 years old, (iii) 5 feet, 10 inches tall, and (iv) about 160 pounds in weight. The evidence indicated that, at the time of his arrest, the defendant was (i) black, (ii) 32 years old, (iii) 5 feet, 11 inches tall, and (iv) 175 pounds in weight. When he was apprehended, defendant was wearing a beige windbreaker that had been described by Figueroa in her initial accounts to the police. Figueroa's testimony at trial corroborated these descriptive details in the police reports. It should also be emphasized that the defendant resided at 220 East 102nd Street, the building that had been the subject of the search after the robbery. Hence, there was sufficient evidence in the record to sustain the conviction. None-theless, some doubts were presented at trial as to the accuracy and reliabil-ity of Figueroa's identification of the defendant. Firstly, she was not wearing her glasses at the time of the robbery. Secondly, the incident in the elevator only lasted about 12 seconds. Thirdly, there were significant omissions in the written reports made by Officer Hunt and Detective Anderson after the robbery. Officer Hunt had prepared a UF-61 form and an incident report after speaking with Figueroa. Neither of these reports mentioned that the robber had a (i) small goatee, (ii) "chinky" eyes, and (iii) glasses. At trial, Hunt testified that Figueroa had orally informed him of these details but that he did not record them. Figueroa confirmed these descriptive details in her own testimony, and additionally, mentioned that the robber had a mustache. Hunt's reports did not mention that the robber had a mustache nor did he testify that Figueroa had orally informed him of that descriptive detail. Detective Anderson had prepared two DD-5 forms in the course of his investigation. The information recorded by Anderson on those forms was substantially the same as that recorded on Hunt's forms. Anderson did not clearly recall Figueroa's description of the robber. He believed that the description included a goatee, but did not include glasses or a mustache. In this evidentiary setting, the defendant called an alibi witness named Olga Benitez. This witness was defendant's "next door" neighbor on the 14th floor of 220 East 102nd Street. Benitez stated that she was standing in front of her building at the time of the robbery. An unknown individual, carrying a pocketbook, ran into the building. She was positive that this individual was not the defendant. Although Benitez later learned that the defendant was arrested for this robbery, she never reported her observation to the police or the District Attorney. In the course of her testimony, Benitez noted that the robber had no facial hair; the defendant, to her knowledge, had never worn a goatee. During the cross-examination of Benitez, the following questions and answers were propounded: "Q Well, do you remember on May 17th when Reginald Phillips got arrested? A No. I wasn't with him. Q When did you first hear he got arrested? A His sister came to the house one day. Q When did you first hear he got arrested? A A couple of days after. Q Then you went to the police and told the police this is the wrong man. I was there

and I saw him and it isn't him? A No, I didn't. Q You came down to the District Attorney's office and told the District Attorney you're prosecuting the wrong man? Miss Sadow: I object. Q When, for the first time did you tell any public official that the wrong man was being prosecuted? Miss Sadow: Objection. The court: I'll permit it. A When the Legal Aid wrote me a letter and asked me would I come down and be a witness. Q You didn't go to the District Attorney's office and you never went to the police and you never told anybody about this? A No. Miss Sadow: Objection. That was not the testimony. The court: Sustained as to form, as to the last question." In his summation, the prosecutor made the following remarks concerning the testimony of Benitez: "Here is somebody she knows who is arrested for a crime and she claims she knows that he didn't do it. He wasn't the man. Never told anybody. Never told anybody and that is incredible. Can you believe that that woman sat with that information for a year, over a year, and never told the District Attorney about it?" An alibi witness may properly be cross-examined as to when and to whom the witness first disclosed the fact of the alibi. The circumstances of such revelation obviously bear upon the witness' testimony. Of course, this line of cross-examination may exceed the bounds of propriety. Thus, it is improper to conduct a cross-examination in such a way as to suggest that there is some duty on the part of the alibi witness to report to the prosecution rather than to the defense. (People v Colarco, 68 AD2d 430, 431-432.) No inference should be drawn from the fact that a person does not go to the police or the District Attorney with an alibi defense. (People v Milano, 59 AD2d 852; People v Hamlin, 58 AD2d 631.) The question of whether a particular series of questions permits an improper inference to be drawn by the jury must be determined on the facts in each case. (People v Colarco, supra, p 432.) It should be emphasized that defense counsel preserved this issue for appellate review by making timely objection at trial. (People v Maschi, 49 NY2d 784.) In the excerpt quoted above, the prosecutor asked Benitez a series of rhetorical questions as to when she reported the alibi to the police and the District Attorney. The prosecution contends upon this appeal that these questions were aimed at impeaching the credibility of Benitez. Concededly, the answers given by Benitez suggested that the alibi defense might have been recently fabricated. Nevertheless, the prosecution's contention evades the more narrow issue of whether Benitez was improperly impeached by this line of questioning. The tenor of the prosecutor's questions undoubtedly left the jurors, impressionable laymen, with the belief that Benitez had a duty to report the alibi to the authorities. Thus, the jury was erroneously permitted to infer that the defendant was guilty from Benitez' belated disclosure of the alibi (People v Milano, supra, p 853). This error was compounded when the prosecutor developed it in his summation. The defendant's conviction was based solely upon the complainant's identification testimony. For the reasons previously discussed, that testimony was suspect as to its accuracy and reliability. Since the evidence in this case was far from overwhelming (People v Rivera, 70 AD2d 625), the errors in the cross-examination and the summation can not be considered harmless beyond a reasonable doubt (cf. People v Burgos, 69 AD2d 783 [Bloom, J., concurring]). Because the defendant was deprived of a fair trial, the judgment of the Supreme Court, New York County, rendered October 13, 1977, convicting him of robbery in the first degree and sentencing him to an indeterminate term of imprisonment for five years, should be reversed, on the law, and a new trial should be ordered.